# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1188

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff-Appellee, | * | |
| | * | Appeal from the United States |
| | * | District Court for the Eastern |
| | * | District of Arkansas |
| v. | * | |
| | * | |
| Phillip Cornelius Pulliam, | * | |
| | * | |
| Defendant-Appellant. | * | |

_____

Submitted: June 12, 2001

Filed: September 12, 2001  CORRECTED 9/27/01

_____

Before LOKEN, HALL,[1] and ROSENBAUM,[2] Circuit Judges.

_____

HALL, Circuit Judge.

Appellant Phillip Pulliam is charged with one count of possession with intent to distribute five kilograms of cocaine in violation of 21 U.S.C. § 841(a)(1).  The cocaine was uncovered during a search of his vehicle.  Pulliam filed a motion to suppress the

_____

[1]The Honorable Cynthia Holcomb Hall, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[2]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota, sitting by designation.

evidence from that search, contending that the search violated his Fourth Amendment rights. After holding an evidentiary hearing, the district court denied the motion. Pulliam appealed the order denying his motion to suppress. We agree with the district court and affirm.

I.

On August 29, 1999, Corporal Karl Byrd of the Arkansas State Police was patrolling Interstate 40 in his marked state trooper vehicle. At approximately 1:50 a.m., he saw a silver car with a Tennessee license plate abruptly correct its course on the highway. Byrd suspected that an abrupt lane change at that hour of the day indicated driver fatigue or intoxication. He followed the silver car in his marked state trooper vehicle for two miles. During that time, Byrd saw the silver car cross the fog line, the solid white line that separates the shoulder from the highway, twice.

Byrd believed that the driver had violated Arkansas law by crossing the fog line. He pulled the driver over. The car was driven by Pulliam, an African-American male. An African-American female and an infant were passengers. Byrd told Pulliam of the reason for the stop and asked for his license and registration. After Pulliam produced his driver's license and rental car agreement, Byrd asked Pulliam to come sit in his patrol car. Byrd told Pulliam that he was going to issue him a warning ticket for improper lane use. Byrd testified that by this point he no longer suspected Pulliam of driving under the influence of alcohol. There was no problem with the rental agreement and a computer check on Pulliam's license did not reveal any outstanding warrants.

While Byrd was writing out the ticket for Pulliam's traffic violation, he began talking to Pulliam. Byrd testified that Pulliam seemed nervous. Pulliam told Byrd that he had taken his aunt to North Little Rock. Pulliam could not say where his aunt's home was, but said that he knew how to get there. Pulliam also said that the woman in the car was his girlfriend and the infant was his child.

2

The evidence is unclear as to what happened next. Either Byrd gave the driver's license and rental agreement back to Pulliam before going to talk to the passenger or Byrd first talked to the passenger and then returned to the patrol car and handed the license and agreement back to Pulliam. Byrd stated that he questioned the passenger to verify Pulliam's story. The passenger's story conflicted with Pulliam's. She said that she was only Pulliam's friend, that they were visiting an uncle in Little Rock, and that the child was not Pulliam's.

According to the district court's findings of fact, Byrd returned Pulliam's license and rental agreement, and <u>then</u> asked if he could search Pulliam's vehicle. Byrd showed Pulliam a consent form, which stated that Pulliam did not have to consent and that he was free to leave. Byrd himself told Pulliam that he was free to leave. Nevertheless, Pulliam agreed to the search. According to the district court's findings of fact, only after obtaining consent to the search, Byrd radioed another unit with a drug detection dog to assist in the search.

Byrd began his search. He found a large decorative bag that contained a heavy wrapped package that smelled of detergent. Byrd knew that detergent is often used as a masking agent for illegal controlled substances. Byrd placed the package on the ground outside the car. The drug sniffing dog ran around the package, then began licking at the package and biting it.

Byrd then picked up the package and placed it on the hood of his patrol car. As he was about to open it, Pulliam stepped out of the patrol car and said, "You can't open that." Byrd explained that he had probable cause to open the package. Pulliam then stated that the package was not his. Byrd opened the box and found a large amount of cocaine poured into a Tide detergent box. Pulliam was arrested.

After the district court rejected Pulliam's motion to suppress, he entered a conditional guilty plea under Rule 11(a)(2) of the Federal Rules of Criminal Procedure.

3

The court sentenced him to 120 months of imprisonment and five years of supervised release. A few days after the entry of judgment, Pulliam filed this appeal.

This Court examines the factual findings underlying the district court's denial of a motion to suppress for clear error. See United States v. Clayton, 210 F.3d 841, 845 (8th Cir. 2000). It reviews de novo the ultimate question of whether the Fourth Amendment has been violated. See id.

## II.

It is well-established that a traffic violation, however minor, creates probable cause to stop the driver of a vehicle. See United States v. Beck, 140 F.3d 1129, 1133 (8th Cir. 1998). Byrd stopped Pulliam for drifting over the fog line twice in two miles, a violation of Ark. Code Ann. § 27-51-302. Section 27-51-302 provides that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane . . . ." Pulliam does not dispute that he moved out of his lane and does not claim that he needed to move out of his lane to avoid something in the road. Pulliam is right to argue that penal statutes should be strictly construed, but even under a strict construction, Byrd had him dead to rights for a traffic violation. See United States v. Barberena-Jimenez, 1996 WL 83002, *2 (8th Cir., Feb. 28, 1996) (defendant was observed crossing over the fog line several times; the Court explained: "The evidence indicates that Barberena did not maintain his automobile in a single lane of traffic. This constitutes an offense in Arkansas."); see also United States v. Ozbirn, 189 F.3d 1194, 1198 (10th Cir. 1999) (finding probable cause for a traffic stop when a vehicle drifted onto the shoulder twice in less than a quarter of a mile; the applicable Kansas statute states that "[w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic . . . [a] vehicle shall be drive as nearly as practicable entirely within a single lane"); cf. Smith v. City of Little Rock, 806 S.W.2d 371, 373 (Ark. 1991) (holding that weaving left of the center line was a violation of § 27-51-302).

4

Pulliam suggests that Byrd targeted him because he fit the profile of a drug trafficker. Conducting a search solely because a suspect fits a drug courier profile violates the Fourth Amendment. See Garrett v. Godwin, 569 F. Supp. 106, 121 (E.D. Ark. 1982). But Byrd did not state that he stopped Pulliam because he fit a particular profile. In fact, he testified that he could not determine Pulliam's race until he had stopped his car and approached his window. We see no evidence that Byrd targeted Pulliam because he fit a particular profile. Instead, Byrd followed Pulliam because he saw him make an abrupt lane change that could indicate driving under the influence. And once Byrd saw Pulliam violate § 27-51-302, he was entitled to stop his car.

III.

Pulliam contends that even if the traffic stop was legal, Byrd violated his Fourth Amendment rights by continuing to detain him after he had finished investigating the traffic violation. Byrd asked for Pulliam's license and registration, wrote up a traffic ticket, and questioned Pulliam about his trip while Pulliam was in the back of his squad car. Byrd had a right to do all of these things. See United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994) (holding that a reasonable investigation of a traffic stop typically includes asking for a license and registration, asking the driver to sit in the patrol car, and asking about destination and purpose of travel).

Byrd next either held on to Pulliam's license and registration while he interrogated Pulliam's passenger or returned the license and registration and then interrogated the passenger. Either way, Byrd continued to detain Pulliam after he had completed the purposes of his initial traffic stop. Unless events transpired during the traffic stop that gave rise to a reasonable suspicion justifying Byrd's continued detention of Pulliam, Pulliam's Fourth Amendment rights were violated. See Beck, 140 F.3d at 1134-35; Ramos, 42 F.3d at 1164.

In either scenario, Pulliam's answers to Byrd's questions gave him the reasonable suspicion needed to justify expanding the scope of his investigation to

5

interrogate Pulliam's passenger. Pulliam stated that he had taken his aunt to Little Rock, but could not remember where she lived. Contradictory statements establish the reasonable suspicion necessary to detain a motorist further and to interview passengers. See United States v. Edmisten, 208 F.3d 693, 694 (8th Cir. 2000) (defendant's statement that he had known the passengers for several years but could not recall their last names established reasonable suspicion). Byrd's interview of the passenger revealed more inconsistencies. Pulliam said that the passenger was his girlfriend, the infant was his child, and that they were visiting an aunt in Little Rock. The passenger said that she was only Pulliam's friend, the child was not Pulliam's, and that they were visiting an uncle in Little Rock. These inconsistencies justified Pulliam's further detention while Byrd continued to investigate. See id.

After Byrd questioned Pulliam and his passenger and returned Pulliam's license and registration, Byrd asked Pulliam for permission to search his car. The issue is whether Pulliam's consent to the search was consensual. If the search and Pulliam's decision to remain with Byrd were consensual, then there was no Fourth Amendment violation. But if a reasonable person would not have believed himself free to leave, then the search was not consensual. See Beck, 140 F.3d at 1135. Despite the inconsistencies in the stories of Pulliam and his passenger, Byrd had no probable cause to think Pulliam was carrying drugs. See United States v. Dortch, 199 F.3d 193, 199 (5th Cir. 1999) (holding that inconsistent answers about ownership of the vehicle and travel itinerary were not enough to give rise to a reasonable suspicion that defendant was trafficking in drugs). Thus, unless the search was consensual it was illegal.

An unlawful seizure does not occur just because an officer approaches an individual to ask some questions or requests permission to conduct a search. This is true even if the officer has no reason to suspect the individual of unlawful activity. See United States v. White, 81 F.3d 775, 779 (8th Cir. 1996). A request for permission to search only gives rise to a Fourth Amendment violation when the officer implies that compliance with her request is required. See id. Circumstances held to indicate that

compliance is required include the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.  See id.

None of those circumstances existed here.  Byrd told Pulliam that he did not have to consent to the search and was free to leave.  Even Pulliam admits that Byrd told him several times that he was free to go. Although an officer is not obligated to inform a suspect of his right to refuse consent to a search, an officer's decision to provide such information is a "significant" factor in determining voluntariness.  United States v. Zamoran-Coronel, 231 F.3d 466, 470 (8th Cir. 2000).  Unlike the officer in Beck, Byrd did not tell the defendant that if he refused to consent to the search, a canine unit would conduct a drug sniff of his automobile.  Pulliam also relies on United States v. Dortch, but unlike the officer in that case, Byrd did not continue to hold on to the defendant's license and rental papers or tell the defendant that his car would be detained until the canine unit arrived.[3]  Pulliam signed the consent form. We agree with the district court that Pulliam voluntarily consented to the search and the drugs were admissible.

AFFIRMED.

---

[3] Byrd testified at trial that he thought that he had enough suspicion to detain Pulliam's vehicle until the drug sniffing dog arrived *even if Pulliam did not consent to a search*.  Pulliam also argues that because his signature is not on the traffic ticket, we must infer that Byrd never returned his license and rental agreement and thereby held him against his will.  The district court found, however, that Byrd did not tell Pulliam that he would detain the car until the drug dog arrived and that Byrd did, in fact, return Pulliam's license.  We see no reason to dispute the findings of the district court.  See United States v. Galvan-Muro, 141 F.3d 904, 906-07 (8th Cir. 1998) ("As with any other evidentiary issue, our review is on the record before us and we may not substitute our factual findings for those of the trial judge.").

A true copy.


Attest:


       CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.