# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1229

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Appellee, | * |
| | * |
| v. | * |
| | * |
| Ines Herrera Martinez, | * |
| | * |
| Appellant. | * |

_____

No. 03-1233

_____

Appeals from the United States
District Court for the District
of South Dakota.

| | | |
|---|---|---|
| United States of America, | * | [PUBLISHED] |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | |
| | * | |
| Alfonso Cortez-Gomez, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: November 18, 2003

Filed: January 14, 2004

_____

Before MURPHY, LAY, and FAGG, Circuit Judges.
_____

PER CURIAM.

A jury found Ines Herrara Martinez and Alfonso Cortez-Gomez guilty of possession with intent to distribute a controlled substance, and further found Martinez guilty of illegal reentry after deportation. On appeal, Martinez and Cortez-Gomez contend the district court[*] erroneously denied their suppression motions because the initial traffic stop and the continued detention which resulted in the discovery and seizure of drugs were both illegal. Cortez-Gomez additionally challenges the district court's refusal to admit into evidence at trial a purported confession by Martinez. For the reasons that follow, we affirm.

On April 8, 2002, Martinez and Cortez-Gomez were traveling eastbound on a South Dakota interstate in a 1988 Dodge Ram, while Trooper Matt Oxner was traveling westbound with a drug dog in his car. Oxner observed defendants' vehicle, noticed at least one Hispanic occupant and a California license plate, and turned around to follow the vehicle. Oxner observed the right tires of the vehicle cross the fog line, activated a video camera, ran a registration check, discovered the vehicle was registered to one Sandoval Crescencio from California, observed no traffic violations other than the single fog-line crossing during this time, and proceeded to stop the vehicle for the line-crossing incident. Oxner approached the vehicle and told Martinez, the driver, Oxner had stopped him because his vehicle crossed the fog line, and Martinez acknowledged he had done so. Martinez produced his driver's license, registration, and insurance information. Martinez, whose driver's license was from Washington, D.C., followed Oxner back to the patrol car, told Oxner he had just purchased the vehicle in Los Angeles, and he and Cortez-Gomez were traveling to

_____

[*]The Honorable Lawrence L. Piersol, Chief Judge, United States District Court for the District of South Dakota.

Chicago to look for work. Oxner told Martinez Oxner was going to issue a warning ticket for the traffic violation and walk his drug dog around the vehicle. The dog alerted, and Oxner searched the vehicle, observing certain suspicious things such as areas where screws had been removed and replaced, but finding no controlled substances. In the interim, Oxner had questioned Martinez about his nationality and immigration status, and had called Border Patrol. The vehicle was ultimately impounded, Martinez and Cortez-Gomez were taken into custody, and packages containing 4,931.9 grams of cocaine were found inside the back seat of the vehicle.

Martinez and Cortez-Gomez argue the traffic stop was pretextual, despite Oxner's testimony that he believed a single incident of crossing the fog line was a violation of a South Dakota statute requiring the driver to stay "as nearly as practicable" within one traffic lane. Martinez and Cortez-Gomez contend Oxner's testimony he believed Hispanics were often used to transport drugs supports their contention that he stopped them solely based on their nationality. Further, even if the initial traffic stop was lawful, they also argue Oxner's continued detention of them --questioning them about their citizenship, calling Border Patrol, and pursuing a search--was illegal, because Martinez appeared to have a valid driver's license and responded reasonably to Oxner's questions.

Although a pretextual traffic stop violates the Fourth Amendment, any traffic violation provides a police officer with probable cause to stop a vehicle. See United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995). We agree with the district court's determinations the stop in this case was supported by probable cause, and defendants did not show discriminatory enforcement of the traffic laws by challenging Oxner's motivation in their case. See Whren v. United States, 517 U.S. 806, 813 (1996) (individual officer's motivation is irrelevant for Fourth Amendment purposes when there is probable cause for a stop, but selective enforcement of laws may violate Equal Protection Clause); United States v. Pulliam, 265 F.3d 736, 739 (8th Cir. 2001) (finding probable cause existed to stop vehicle that crossed fog line

twice); Pereira-Munoz, 59 F.3d at 791 ("[s]o long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant" for purposes of determining stop's lawfulness). We also find the continued detention was justified by the events which transpired after the vehicle was stopped. See United States v. Linkous, 285 F.3d 716, 719-21 (8th Cir. 2002) (officer making traffic stop does not violate Fourth Amendment by asking driver for his destination and purpose, checking license and registration, or requesting driver to step over to patrol car; nor does short detention for dog sniff after completion of traffic stop violate Fourth Amendment). In our view, the district court correctly denied the motions to suppress. See id. at 720 (standard of review).

Turning to Cortez-Gomez's argument about Martinez's statement made during a police interview, during which Martinez purportedly admitted he knew there were drugs in the car to explore the possibility of cooperating, we find no abuse of discretion in the district court's refusal to admit this evidence. See Williamson v. United States, 512 U.S. 594, 602-03 (1994) (concerning admission of statements against penal interest as hearsay exception under Fed. R. Evid. 804(b)(3); statement must be truly self-inculpatory rather than attempt to curry favor); United States v. Mendoza, 85 F.3d 1347, 1351 (8th Cir. 1996) (standard of review).

We affirm the judgment of the district court.

LAY, Circuit Judge, dissenting.

If there ever was a clear case of racial profiling, it is this case. By affirming these convictions, the majority gives support to police officers in this circuit who seize and search individuals because of their race. I respectfully dissent.

In the present case, Martinez and Cortez-Gomez were driving through the State of South Dakota in broad daylight when a state trooper traveling in the opposite

direction observed their vehicle. The unrefuted evidence is that when the trooper noticed that the driver (Martinez) was Hispanic and that the vehicle he was driving bore California plates, the trooper did a "180" on the highway and proceeded to follow the vehicle. After doing so for approximately five miles, the trooper pulled the vehicle over for momentarily crossing the fog line in violation of South Dakota law.[1] I respectfully submit that the obvious purpose of such a statute is to apprehend only those drivers who are intoxicated or otherwise incapable of controlling their vehicles; one isolated occurrence of crossing the fog line is not sufficient to constitute a violation. If it were, practically every driver of a vehicle traveling on a South Dakota roadway could be stopped. No doubt acknowledging this fact, other courts construing nearly identical traffic statutes have held that minor conduct such as that which occurred in this case is an insufficient basis upon which to stop the driver of the vehicle. See United States v. Freeman, 209 F.3d 464, 466 (6th Cir. 2000) ("We cannot, however, agree that one isolated incident of a large motor home partially weaving into the emergency lane for a few feet and an instant in time constitutes a failure to keep the vehicle within a single lane 'as nearly as practicable.'"); United States v. Gregory, 79 F.3d 973, 978 (10th Cir. 1996) ("[A]ny vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity.").

Even assuming that the Defendants' singular instance of crossing the fog line provided the trooper with the requisite justification to stop their vehicle, the facts amply demonstrate that the trooper's subsequent conduct went beyond the boundaries imposed by the Fourth Amendment. It is beyond dispute that when the trooper stopped their vehicle, the Defendants were seized within the meaning of the Fourth Amendment. See Berkemer v. McCarty, 468 U.S. 420, 439 (1984); see also United

---

[1]The statute provides in pertinent part: "On a roadway divided into lanes, a vehicle shall be driven *as nearly as practicable* entirely within a single lane and may not be moved from such lane until the driver has first ascertained that such movement can be made with safety." S.D. Codified Laws § 32-26-6 (emphasis added).

States v. Cortez, 449 U.S. 411, 421 (1981). In order to be constitutionally permissible, such a seizure must be "reasonably related in scope to *the justification for [its] initiation*." Berkemer, 468 U.S. at 439 (quoting Terry v. Ohio, 392 U.S. 1, 29 (1967)) (emphasis added); see also Florida v. Royer, 460 U.S. 491, 500 (1983) ("The scope of the detention must be carefully tailored to its underlying justification."). This circuit has repeatedly stated that when the police engage in a routine traffic stop of a vehicle, the permissible scope of the seizure is limited to asking questions regarding the purpose for the stop, as well as "asking for the driver's license and registration, requesting that the driver sit in the patrol car and asking the driver about his destination and purpose." United States v. Bloomfield, 40 F.3d 910, 915 (8th Cir. 1994).

It is also well-settled in this circuit that unless this limited investigation gives rise to reasonable suspicion or probable cause of additional criminal activity, a police officer is prohibited from expanding the scope of the detention. See United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994) ("If, however, no answers are inconsistent and no objective circumstances supply the trooper with additional suspicion, the trooper should not expand the scope of the stop."); see also United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990). The record clearly shows that Martinez's driver's license and registration were in proper order. The record further shows that Martinez's responses to the trooper's questions regarding his destination and purpose did nothing to arouse suspicion. Simply put, the trooper had no reasonable or articulable basis upon which to suspect the Defendants of drug activity.[2] Nevertheless, he subjected their vehicle to a canine sniff.

---

[2]The sole case relied upon by the majority for its holding that the canine sniff was lawful, United States v. Linkous, does not support their position. Linkous only upheld a canine sniff following a routine traffic stop where the police officer had reasonable suspicion that the driver was engaged in criminal activity. See Linkous, 285 F.3d at 720 ("The combination of suspicious factors here gave Officer Dixon grounds to detain [the defendants] for a dog sniff of their van. There were a number

I believe that the use of the drug dog was an unconstitutional expansion of an otherwise valid <u>Terry</u> stop. To be sure, the use of a well-trained dog to detect the presence of narcotics does not constitute a search within the meaning of the Fourth Amendment, <u>see</u> <u>City of Indianapolis v. Edmond</u>, 531 U.S. 32, 40 (2000), but this is beside the point. As <u>Terry</u> and its progeny make clear, the proper inquiry is whether the Defendants' rights to be free from an unreasonable *seizure* were violated, not a search. <u>See</u> <u>id.</u> at 47 n.2; <u>see also</u> <u>United States v. Place</u>, 462 U.S. 696, 706-707 (1983) (permitting the use of a canine sniff only *after* the police had reasonable suspicion of drug activity to support the seizure of an individual passenger and his luggage.). Cases from this circuit implicitly (if not explicitly) recognize that conduct that does not amount to a search can render the prior seizure of a defendant unconstitutional. Clearly, asking the driver questions about drug activity (or anything else unrelated to the conduct underlying the traffic stop) does not amount to a search. Nevertheless, we have strictly prohibited an officer from engaging in this conduct. <u>See</u> <u>Bloomfield</u>, 40 F.3d at 915; <u>Ramos</u>, 42 F.3d at 1163. Taken to its logical conclusion, the Government's position would permit all police officers who have drug dogs to stop a vehicle on a minor traffic infraction and then conduct a canine sniff while waiting for the driver's license and registration to check out. This is completely contrary to the teachings of <u>Terry</u>.[3]

I think it fairly obvious in this case that when the trooper stopped the Defendants' vehicle for crossing the fog line, he cared little about the purported violation. The trooper made no mention of the violation and did not at any time write

of factors which taken together created a reasonable suspicion of criminal activity.").

[3]In the present case, the officer told the driver that he routinely used the dog to sniff all vehicles upon traffic stops. If this were true, I submit that such conduct would be illegal in the absence of reasonable suspicion or probable cause to believe that the vehicle contained drugs. However, during the hearing on the motion to suppress, the trooper testified that his use of the dog during the Defendants' detention was only the second time that he had done so.

a ticket for the purported violation. Instead, he did so for the express purpose of inquiring whether the Defendants were transporting drugs. During the hearing on the motion to suppress, although he denied following the Defendants because of their race, the trooper could offer no other explanation for doing so. The trooper acknowledged that at the time he made the "180," he had observed no traffic violation on the part of the Defendants; instead, he knew only that the vehicle bore California license plates and that its occupants were Hispanic. His only rationale for following the vehicle was that Hispanics from California would no doubt be carrying drugs. I cannot imagine a more clear case of racial profiling than what occurred here. Cf. Whren v. United States, 517 U.S. 806, 813 (1996).[4]

I am aware that the general public feels that since these Defendants were actually carrying drugs, the actions of the trooper are excusable (or perhaps even laudable). However, the courts clearly do not condone this type of rationale because it has long been held that an illegal search or seizure is not justified by the contraband it uncovers. See Byars v. United States, 273 U.S. 28, 29 (1927) ("Nor is it material that the search was successful in revealing evidence of a violation of a federal statute. A search prosecuted in violation of the Constitution is not made lawful by what it brings to light . . . ."). The Fourth Amendment "guarantee of protection against unreasonable searches and seizures extends to the innocent and guilty alike." McDonald v. United States, 335 U.S. 451, 453 (1948).

---

[4]That the trooper's true purpose in seizing the Defendants was to search for drugs is further evidenced by his conduct following the alert by the drug dog. After no drugs were found during a roadside search of their vehicle, the trooper continued to detain the Defendants for more than one hour, during which time he asked them repeated questions about their immigration status. The trooper also called the Border Patrol, which reported that both parties were in this country as illegal aliens, and requested that the officers hold both occupants in jail. At the police station, the vehicle was more thoroughly searched and drugs were found sewn into a seat cushion, resulting in the Defendants' convictions.

-8-

Involved here is an important issue as to whether police may stop any vehicle traveling upon a highway because the driver is a member of a minority race, under the whim that the driver has committed a misdemeanor traffic offense, and then conduct a full search of the vehicle in the hope of uncovering drugs or other contraband. In my mind, the Fourth Amendment stands as a bulwark to such action, requiring some evidence of reasonable suspicion or probable cause of drug activity before a drug sniff can be used attendant to a seizure, especially one premised upon a superficial allegation that the driver of a vehicle has crossed over the fog line. The majority holds otherwise and thereby lends its approval to selective seizures by reason of racial profiling. I hope our court *en banc* does not come to that result.

_____