2004 SD 94

**STATE of South Dakota, Plaintiff and Appellant,**

v.

**Touray AKUBA and Kaisha Paul, Defendants and Appellees.**

**No. 22923.**

Supreme Court of South Dakota.

Argued March 22, 2004.

Decided Aug. 18, 2004.

Lawrence E. Long, Attorney General, Patricia Archer, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellant.

Thomas M. Diggins, Pennington County Public Defender's Office, Rapid City, South Dakota, Attorneys for defendant and appellee Touray Akuba.

Paul John Brankin, Dakota Plains Legal Services, Rapid City, South Dakota, Attorneys for defendant and appellee Kaisha Paul.

ZINTER, Justice.

[¶ 1.] Touray Akuba and Kaisha Paul were stopped by a highway patrol officer for speeding. Akuba allegedly consented to a search of the vehicle. During the search, the officer found 177 pounds of marijuana in the trunk. Akuba and Paul moved to suppress, alleging that they were illegally detained and the consent was involuntary. The trial court suppressed. The State now appeals arguing that the detention was legal, that Akuba voluntarily consented to the search, and that Paul had no standing to challenge it. We conclude that the detention was lawful and the consent to search was valid, and therefore, even if Paul had standing to challenge Akuba's consent, the evidence should not have been suppressed. We reverse.

### Facts and Procedural History

[¶ 2.] On September 2, 2002, highway patrol officer Matt Oxner was patrolling Interstate 90, east of Rapid City. Oxner was a canine officer focused on drug interdiction. While traveling west, Oxner observed a vehicle traveling east through a construction zone. Because the vehicle appeared to be catching up with vehicles in front of it, Oxner activated his radar and determined that the vehicle was traveling 68 mph in a 65 mph construction zone. Oxner turned around, pursued the vehicle, and followed it for approximately two miles. Oxner also requested a license plate check to determine if the vehicle was stolen. A radio dispatcher informed Oxner that the vehicle was a rental car from Oregon.

[¶ 3.] Oxner activated his lights and stopped the vehicle. Akuba was driving and Paul (Akuba's brother's girlfriend) was in the front passenger seat. Oxner observed an atlas, blankets, pillows, and food containers in the vehicle, which indicated to him that they were driving without stopping overnight.

[¶ 4.] Oxner informed Akuba that Oxner had stopped the car to warn Akuba of the speeding violation. Oxner obtained Akuba's driver's license and the car rental agreement. While at the car, Oxner noticed no evidence of marijuana or other illegal substances. He informed Akuba that he was going to give him a warning ticket for the speeding violation, and he asked Akuba to accompany him back to the patrol car to issue the ticket.

[¶ 5.] Upon entering the patrol car, Oxner began writing the warning ticket. In that process, Oxner engaged Akuba in routine traffic stop questioning. He first asked their destination. Akuba told Oxner that they were traveling from Seattle to Chicago. They then engaged in a casual conversation concerning the purpose of the trip to Chicago, where the car was rented from, and where Akuba worked. Akuba told Oxner they were going to Chicago to meet his brother. Akuba also indicated that they were driving straight through and intended to stay for a couple of days. He finally told Oxner that he worked at a business in Seattle.

[¶ 6.] Oxner then reiterated that he was only going to give Akuba a warning for the speeding violation, but Oxner also told Akuba that he was going to check his driver's license. In the course of that short conversation, they not only discussed the driver's license check, but Oxner also mentioned a drug dog sniff, and he requested consent to search the car. Akuba consented on two occasions. The transcript reveals those consents were given during the scope of the initial stop to issue the warning ticket and check Akuba's driver's license.

OFFICER: Everything's okay with your license?

AKUBA: Yep.

OFFICER: Okay. Have you ever been in trouble before at all?

AKUBA: No.

OFFICER: Okay. Then what I normally do, Touray, being a canine officer—

AKUBA: Uh-hum.

OFFICER:—okay, I got a drug dog in the back, and what I normally do is walk him around most vehicles that I have stopped checking for all illegal—the different o[dors] of illegal drugs, marijuana—

AKUBA: Um-hum.

OFFICER:—cocaine, methamphetamine, heroin—

AKUBA: Yeah.

OFFICER:—anything like that. Any prescription drugs, anything like that. So I'm going to go ahead and walk him around the car. Do you think he's going to smell anything from the car?

AKUBA: Nothing. Nothing.

OFFICER: Nothing. Okay. Is it okay if I look in the car?

AKUBA: Yeah.

OFFICER: I can look?

AKUBA: Um-hum.

OFFICER: Okay.

Oxner noticed that Akuba's nervousness increased at the mention of the drug dog.[1] After further brief conversation before the driver's license check came back from the dispatcher, Oxner confirmed that Akuba had consented to a search stating: "So you'll go ahead and let me look in the car then, Touray?" Akuba consented a third time, replying, "Um-hum."

[¶ 7.] While still waiting for the driver's license check to return from the dispatch-

---

**1.** Oxner's drug dog was in the car with them as they had this conversation. While Akuba was in the car, the dog whined. The dog did not bark until Akuba was out of the car and Oxner opened the trunk.

er, they continued their conversation about Akuba's employment, the warning ticket, and the search of the vehicle:

OFFICER: So what kind of business do you work at? An African business?

AKUBA: African business, yeah.

OFFICER: What's that?

AKUBA: African clothes.

OFFICER: Clothes?

AKUBA: (No response could be heard....)

OFFICER: Is it your store or somebody else's?

AKUBA: Ah, my brother and his partner.

OFFICER: Brother's store?

AKUBA: (No response could be heard....)

OFFICER: Here's your license ... back, Touray. Here's just a warning for the speed. You don't have to do nothing with the warning. You can throw that away. Just watch your speed a little closer when you go into those zones, okay?

AKUBA: (No response could be heard....)

OFFICER: Then when this [driver's license] comes back you'll be free to go. If you let me look real quick—

AKUBA: Um-hum.

OFFICER:—we'll do that—

AKUBA: Um-hum.

OFFICER:—get you going here. . . .

When the driver's license check subsequently came back, Oxner told the radio dispatcher that he "had a vehicle for a search." He also stated to Akuba, "Okay, you guys will be free to go if you let me search real quick. I'll just have you stand in front of the car, okay?" Akuba again replied, "Yeah." [2]

[¶ 8.] Oxner and Akuba then got out of the patrol car and approached the rental car. Oxner did not take the drug dog with him. Upon approaching the car, Oxner confirmed to Paul that "Touray is going to let me look in the vehicle real quick and we'll get you guys going." Oxner then asked Paul and Akuba to stand near the front of the car. Akuba and Paul stood silently without objection while Oxner searched the vehicle. Oxner first looked in the front passenger side of the car. He then unlocked the doors and searched the back seat. After searching the interior of the car for about two minutes, Oxner took the keys from the ignition and searched the trunk. Oxner found four large duffel bags containing 177 pounds of marijuana. The entire stop, including the search, took approximately ten minutes.

[¶ 9.] Akuba and Paul were placed under arrest and later interviewed by an agent of the Division of Criminal Investigation. Akuba admitted that he knew the marijuana was in the trunk and that he

---

**2.** Akuba contends his consent was coerced because his freedom "to leave" was improperly tied to Oxner's statements: "If you let me look real quick" and "if you let me search real quick." The spacing and paragraphing of this written transcript could suggest that the two subjects were tied together. However, the validity of that inference is refuted by the audio of the stop, which includes the officer's tone and inflection. There is no other record evidence on this issue. We have reviewed the audio portion of the videotape and conclude that Oxner was not asking for consent a fourth and fifth time in these exchanges. Akuba had already consented to a search of the car three times, and these latter exchanges appear to be casual conversation executing the consent to search already given. This is also confirmed by the officer's statement to the dispatcher (that he "had a vehicle for a search") and the officer's later statement to Paul, "Touray is going to let me look in the vehicle real quick and we'll get you going." *Infra* ¶ 8. For a further discussion of this issue, *see infra* ¶ 28, *et. seq.*

was paid $1,000 to transport it to Chicago. Akuba and Paul were subsequently charged with possession of marijuana, more than ten pounds, in violation of SDCL 22–42–6.

[¶ 10.] After pre-trial hearings, the trial court granted Akuba's motion to suppress. The court ruled that the State failed to prove that Akuba had voluntarily consented to the search. The court arrived at that conclusion by reasoning that Oxner improperly expanded the scope of the stop by engaging in "impermissibly intrusive" questioning beyond the scope of a routine traffic stop. The court held that asking for Akuba's consent to search the vehicle, when the officer had no reasonable suspicion to do so, was impermissibly intrusive questioning that resulted in an illegal detention. The court ultimately concluded that the illegal detention, coupled with a "threat" [3] to use the drug dog, coerced Akuba's consent and rendered it involuntary as a matter of law. In Paul's related motion, the trial court suppressed, concluding that the evidence was the fruit of an illegal detention. The trial court declined to address Paul's standing to object to the search.

[¶ 11.] The State raises the following issues on appeal:

1. Whether the State's burden of proving voluntary consent should be by a "preponderance of the evidence" or by "clear and convincing evidence."

2. Whether the warrantless search of the vehicle was authorized by Akuba's consent.

3. Whether Paul, having failed to make any showing that she possessed a legitimate expectation of privacy in the trunk of the rental vehicle, had standing to challenge the search.

**3.** We see no "threat" in this record. *See also supra* n 1.

## Analysis and Decision

1. **Whether the State's burden of proving voluntary consent should be by a "preponderance of the evidence" or by "clear and convincing evidence."**

[¶ 12.] "Even when police officers have neither probable cause nor a warrant, they may search an area if they obtain a voluntary consent from someone possessing adequate authority over the area." *United States v. Chaidez*, 906 F.2d 377, 380 (8thCir.1990) (citing *United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974)). "It has been said that consent to conduct a search satisfies the Fourth Amendment, thereby removing the need for a warrant or even probable cause." *State v. Sheehy*, 2001 SD 130, ¶ 11, 636 N.W.2d 451, 453 (citations omitted). "For consent to a search to be valid, the totality of the circumstances must indicate that it was voluntarily given." *State v. Almond*, 511 N.W.2d 572, 573 (S.D.1994) (citations omitted).

[¶ 13.] We have previously required that "[t]he State must establish voluntariness by clear and convincing evidence[.]" *State v. Zachodni*, 466 N.W.2d 624, 629 (S.D.1991) (citations omitted). However, most courts no longer require clear and convincing evidence. Today we conform our burden of proof to that used by the United States Supreme Court and the Eighth Circuit Court of Appeals.[4] They hold that "[i]n deciding whether a consent was voluntary, courts should require the prosecution to prove voluntariness by a preponderance of the evidence." *Chaidez*, 906 F.2d at 380 (citing *Matlock*,

**4.** At oral argument, Akuba's attorney conceded that the change is "well supported."

415 U.S. at 177, 94 S.Ct. 988). Numerous other courts also apply the preponderance burden of proof.[5] We finally note that the preponderance burden is consistent with the burden we have applied in the closely related issue of the voluntariness of a confession. *See State v. Tuttle*, 2002 SD 94, ¶ 21, 650 N.W.2d 20, 30–31. We now hold that the preponderance burden should be applied when considering the voluntariness of a consent to search.[6]

**2. Whether the warrantless search of the vehicle was authorized by Akuba's consent.**

### Legality of the Stop

[¶ 14.] As a preliminary matter, Akuba questions the legality of the stop. He asserts that Oxner did not stop him for speeding. Akuba argues that the testimony regarding "the alleged speeding violation" shows that "there may well have been no such violation." Akuba suggests that Oxner stopped the car merely because Akuba was an African American in an out-of-state vehicle.

[¶ 15.] However, after reviewing the videotape of the stop, we agree that Akuba's suggestion has no merit. As the trial court specifically stated in its memo-

randum opinion, there was an objective basis for the stop of Akuba's vehicle, i.e., its speed of 68 mph in a 65 mph zone. This speeding offense warranted the stop because a traffic violation is an objectively reasonable basis to stop a vehicle.

> While the stop may not be the product of mere whim, caprice or idle curiosity, it is enough that the stop is based upon "specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *State v. Herrboldt*, 1999 SD 55, ¶ 7, 593 N.W.2d 805, 808 (quoting *Spenner v. City of Sioux Falls*, 1998 SD 56, ¶ 14, 580 N.W.2d 606, 611). Under these standards, *it is well established that a traffic violation, however minor, creates sufficient cause to stop the driver of a vehicle.*" *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95–95 (1996); *State v. Kenyon*, 2002 SD 111, ¶ 16, 651 N.W.2d 269, 274.

*State v. Chavez*, 2003 SD 93, ¶ 16, 668 N.W.2d 89, 95 (emphasis added).

[¶ 16.] Although the State agrees that the trial court "expressed displeasure with the manner in which the stop was made," and although Akuba hints that Ox-

**5.** *See, e.g., United States v. Perez–Montanez*, 202 F.3d 434 (1st Cir.2000); *United States v. Raibley*, 243 F.3d 1069 (7thCir.2001); *People v. James*, 19 Cal.3d 99, 137 Cal.Rptr. 447, 561 P.2d 1135 (1977); *State v. Patterson*, 58 Haw. 462, 571 P.2d 745 (1977); *State v. Kilby*, 130 Idaho 747, 947 P.2d 420 (1997); *People v. Robinson*, 322 Ill.App.3d 169, 255 Ill.Dec. 35, 748 N.E.2d 739 (2001); *State v. Howard*, 509 N.W.2d 764 (Iowa 1993); *State v. Hardyway*, 264 Kan. 451, 958 P.2d 618 (1998); *Cook v. Commonwealth*, 826 S.W.2d 329 (Ky.1992); *State v. Kelly*, 376 A.2d 840 (Me.1977); *State v. Wilson*, 279 Md. 189, 367 A.2d 1223 (1977); *State v. Harris*, 590 N.W.2d 90 (Minn.1999); *State v. Middleton*, 43 S.W.3d 881 (Mo.Ct.App. 2001); *State v. Sawyer*, 145 N.H. 704, 764 A.2d 936 (N.H.2001); *State ex rel. Juvenile Dept. v. Stephens*, 175 Or.App. 220, 27 P.3d 170 (2001); *State v. O'Dell*, 576 A.2d 425 (R.I.1990); *State v. Ashworth*, 3 S.W.3d 25 (Tenn.Crim.App.1999); *State v. Delaney*, 869 P.2d 4 (Utah Ct.App.1994); *Camden v. Commonwealth*, 17 Va.App. 725, 441 S.E.2d 38 (1994); *State v. Worley*, 179 W.Va. 403, 369 S.E.2d 706 (W.Va.1988); *City of Laramie v. Hysong*, 808 P.2d 199 (Wyo.1991). *But see State v. Johnson*, 116 Nev. 78, 993 P.2d 44 (2000) (clear and convincing standard); *Guevara v. State*, 97 S.W.3d 579 (Tex.Crim.App. 2003) (preponderance standard under federal constitution, but clear and convincing standard under state constitution).

**6.** The trial court applied both burdens of proof, and reached the same result.

ner may have had other subjective reasons for stopping the vehicle, other subjective intent or motivation does not invalidate a stop:

> [B]ecause [the officer] was legally authorized to stop the vehicle, any additional "underlying intent or motivation" would not have invalidated the stop. *United States v. Bloomfield,* 40 F.3d 910, 915 (8thCir.1994), *cert. denied,* 514 U.S. 1113, 115 S.Ct. 1970, 131 L.Ed.2d 859 (1995); *United States v. Cummins,* 920 F.2d 498, 501 (8thCir.1990). Even if [the officer] had other motivations to stop [the vehicle], those subjective reasons were not relevant. They were not relevant because this stop was objectively reasonable, and an objectively reasonable stop is not invalidated even if the stop was pretextual. *State v. Lamont,* 2001 SD 92, ¶ 21, 631 N.W.2d 603, 610 (citing *Arkansas v. Sullivan,* 532 U.S. 769, 772, 121 S.Ct. 1876, 1878, 149 L.Ed.2d 994, 998 (2001)).

*Id.* ¶ 20, 631 N.W.2d 603.[7] Moreover, the fact that Akuba's speeding was a marginal violation is of no consequence. "An officer's observation of a traffic violation, however minor, gives the officer probable cause to stop a vehicle, even if the officer would have ignored the violation but for a suspicion that greater crimes are afoot." *United States v. Luna,* 368 F.3d 876, 878 (8thCir.2004) (citing *United States v. Martinez,* 358 F.3d 1005, 1009 (8thCir.2004)). As the Eighth Circuit recently noted in a case upholding a traffic stop for "expired tags" notwithstanding an allegation of racial profiling: "The United States Supreme Court holds that a traffic stop is constitutional, no matter the officer's subjective intent, so long as the officer had

probable cause to believe that a traffic violation occurred." *United States v. Gomez Serena,* 368 F.3d 1037, 1041 (8thCir.2004) (citing *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)).

### Consent to Search

 [¶ 17.] The trial court's memorandum opinion reveals that its ruling was based on the legal notion that by asking for consent to search, Oxner impermissibly extended the stop beyond the permissible scope of a traffic stop. Relying on *United States v. Ramos,* 42 F.3d 1160 (8thCir.1994), the trial court reasoned that because there was no reasonable suspicion to expand the traffic stop, the request for consent occurred during an illegal detention. The court concluded that because consent was requested during an illegal detention, the consent was involuntary as a matter of law. However, the trial court's application of *Ramos* to this case is misplaced.

[¶ 18.] *Ramos* is distinguishable on its facts. *Ramos* involved an impermissible *detention* of the occupants of a vehicle beyond the *time* necessary for the intrusion associated with the traffic stop. It also involved a request for consent to search within that illegal *detention:* the consent was requested *after* the vehicle's occupants' licenses and registration had been checked and cleared. Here, however, Akuba was still in the officer's car waiting for his warning ticket and license check to be completed when he consented to the search. In fact, only three minutes expired from the time Akuba entered the patrol car until Oxner first asked for consent to search. Therefore, unlike *Ramos,*

---

7. Akuba also fails to cite authority for his position. "[T]his Court could consider it waived for that reason alone." *State v. Sullivan,* 2003 SD 147, ¶ 20, 673 N.W.2d 288, 293

(citing *State v. Banks,* 387 N.W.2d 19, 24 (S.D.1986) (failure to cite supporting authority waives issue on appeal)).

this request for consent occurred during the scope of a valid traffic stop, and any consent obtained during that lawful detention was valid.

[¶ 19.] Akuba, however, argues that Oxner's detention and request for consent was an "arbitrary interference" and an unreasonable "government intrusion on the roadways." We disagree. Akuba and Paul were stopped for speeding, and the traffic portion of the stop did not extend beyond that necessary to complete the warning ticket and license check.[8] Moreover, the questioning that occurred while they were waiting for the license check did not create an illegal detention.

[¶ 20.] An officer does not impermissibly expand the scope of a traffic stop merely by asking the driver questions, even if the subject of the questioning is unrelated to the original purpose of the stop, as long as the questioning does not unduly *extend the duration* of the initial, valid seizure. *Ramos*, 42 F.3d at 1165 (Beam, J., concurring); *United States v. Shabazz*, 993 F.2d 431, 436 (5thCir.1993); *United States v. Purcell*, 236 F.3d 1274, 1279–80 (11thCir.2001); *State v. Parkinson*, 135 Idaho 357, 17 P.3d 301, 307 (2000). After all, "mere questioning … is neither a search nor a seizure." *Shabazz*, 993 F.2d at 436 (citing *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991)). In fact, *Ramos* itself permitted such questioning on subjects like place of origination, destination, employment and the purpose of the trip. *Ramos*, 42 F.3d at 1161. "Typically, a reasonable investigation of a traffic stop may include asking for the driver's license and registration, requesting the driver to sit in

the patrol car, and asking the driver about his destination and purpose." *Id.* at 1163 (citations omitted). That type of questioning is reasonable and not an arbitrary interference.

[¶ 21.] Moreover, Oxner's request for Akuba's consent to search before the traffic stop was completed did not render the stop an impermissible detention. In *Almond*, we quoted *Bostick*, 501 U.S. at 434–35, 111 S.Ct. at 2386, 115 L.Ed.2d at 398–99: "Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual, ask to examine the individual's identification, *and request to search his or her luggage* [.]" 511 N.W.2d at 575 (emphasis added). So also, in *State v. Dreps*, 1996 SD 142, 558 N.W.2d 339, an officer conceded that he had no articulable suspicion when he asked the defendant whether he had any illegal weapons, drugs, or contraband. Nevertheless, we held that "an officer does not have to have probable cause to search before requesting consent to search." *Id.* at ¶ 11, 558 N.W.2d 339.

[¶ 22.] We have arrived at these conclusions because questioning, including a request for consent to search, during the course of a lawful traffic stop, need not be related to the reason for that stop. "[B]ecause [such] questions are neither searches nor seizures, police need not demonstrate justification for each inquiry" as is otherwise necessary under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. *U.S. v. Childs*, 277 F.3d 947, 949 (7thCir.2002). As the Seventh Circuit explained:

> Under the fourth amendment, every search or seizure must be "reasonable,"

---

8. Akuba also concedes that Oxner could have validly taken his drug dog around the vehicle at that time without possessing reasonable suspicion. He concedes that Oxner could have done so while waiting for the license

check to come back, or even immediately after the traffic investigation was finished. *See State v. De La Rosa*, 2003 SD 18, 657 N.W.2d 683.

which normally entails some person-specific basis for suspicion. See *Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000). *But the Supreme Court has held repeatedly that police may approach persons and ask questions or seek their permission to search, provided that the officers do not imply that answers or consent are obligatory.* See, e.g., *Florida v. Rodriguez*, 469 U.S. 1, 5–6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984); *INS v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Mendenhall*, 446 U.S. 544, 552–58, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). *These requests are proper without regard to the absence of reasonable suspicion,* the Court made clear in *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991), because "mere police questioning does not constitute a seizure."

*Id.* at 950 (emphasis added). *See also, Shabazz*, 993 F.2d 431 (holding that questions and request for consent to search four minutes into a traffic stop were not a "seizure," and thus did not require predicate probable cause or reasonable suspicion); *U.S. v. Burton*, 334 F.3d 514, 518 (6thCir.2003) (holding police could, during the course of a traffic stop, ask driver whether he would consent to a search of the automobile); *People v. Moore*, 341 Ill. App.3d 804, 275 Ill.Dec. 361, 792 N.E.2d 836, 843–844 (2003) (brief questioning, during traffic stop, about contraband and request for consent to search vehicle was legal, and reasonable suspicion was unnecessary); *State v. Harris*, 590 N.W.2d 90, 102 (Minn.1999) (noting (1) that generally, questioning in a vehicle stop is not a seizure, and (2) absent a seizure within the meaning of the Constitution, the reasonable suspicion inquiry is unnecessary); *State v. Middleton*, 43 S.W.3d 881 (Mo.Ct. App.2001) (permitting an officer, while writing a motorist a speeding ticket, to ask for consent to search for drugs because an officer may ask for consent to search in the absence of reasonable suspicion or probable cause); *State v. Everson*, 474 N.W.2d 695 (N.D.1991) (holding that an officer was not required to have reasonable suspicion of drug activity before requesting consent to search during a license check conducted in the course of a traffic stop); *State v. Boatman*, 185 Or.App. 27, 57 P.3d 918 (2002) (holding that before necessary paperwork associated with traffic stop was completed, officer could request consent to search even though it was unrelated to the traffic stop and there was no reasonable suspicion that the defendant has engaged in criminal activity); *James v. State*, 102 S.W.3d 162 (Tex.App.2003) (permitting an officer, after giving a warning ticket for minor traffic offenses, to request consent to search because reasonable suspicion to continue detention and search is not required for valid consent following resolution of original reason for stop); 3 LaFave *Search and Seizure* § 8.1 (3d ed 1996).

[¶ 23.] The dissent cites no contrary authority,[9] but instead relates its displea-

---

9. Consequently, the dissent erroneously assumes that the request for consent impermissibly expanded the scope of the traffic stop. However, in *Ohio v. Robinette*, 519 U.S. 33, 35–36, 117 S.Ct. 417, 419, 136 L.Ed.2d 347, 352 (1996), the Supreme Court considered whether a motorist's Fourth Amendment rights were violated where, after initially being stopped for a traffic violation, the motorist was ordered out of his automobile by the police officer and asked if he would consent to a search of the vehicle for illegal contraband. Because the officer's question had exceeded the scope of the traffic stop's initial purpose, the Ohio Supreme Court had ruled that the consent subsequently obtained was

sure with police investigative techniques. However, the dissent's concerns have been considered and rejected by other courts.

> What happened here must occur thousands of times daily across the nation: Officers ask persons stopped for traffic offenses whether they are committing any other crimes. That is not an unreasonable law-enforcement strategy, either in a given case or in gross; persons who do not like the question can decline to answer. Unlike many other methods of enforcing the criminal law, this respects everyone's privacy. There is therefore no reason to doubt the validity of [the driver's] consent. . . .

*Childs,* 277 F.3d at 954.

[¶ 24.] We therefore conclude that the trial court erred in requiring the officer to possess some quantum of suspicion of criminal activity before requesting consent to search. Reasonable suspicion is simply not required in this Fourth Amendment context. An officer need not have reasonable suspicion that a vehicle contains contraband before asking to search it. Here, because the initial traffic stop was not completed when the consent was requested, the scope of the stop was not impermissibly extended. And, because Oxner's request for consent to search was made

within the period of the initial lawful detention, Akuba's consent was not involuntary as a matter of law. *State v. Ballard,* 2000 SD 134, 617 N.W.2d 837.

### The Factual Issue of Consent

 [¶ 25.] Having determined that there was no legal reason to invalidate Akuba's consent, the next issue is whether Akuba actually consented to a search of the vehicle. The State bears the burden of proving, under the totality of the circumstances, that valid consent to search was given. *Sheehy,* 2001 SD 130, ¶ 11, 636 N.W.2d at 453–454 (citing *Almond,* 511 N.W.2d at 573). Whether a valid consent to search exists is generally a question of fact for the trial court. *Id.* "Because the presence or absence of consent to search is a question of fact, the trial court's resolution of that question will be upheld unless our examination of the evidence, construed in a light most favorable to the trial court's findings, convinces us that the finding was clearly erroneous." *Almond,* 511 N.W.2d at 573.

 [¶ 26.] In this case, however, the trial court only made conclusions of law or mixed findings of fact and conclusions of law on this issue. We have no findings of historical fact to which the clearly errone-

---

invalid. The Supreme Court reversed, holding that the Fourth Amendment required only that the detention and question be reasonable under the particular facts of the case. *Id.* at 39, 117 S.Ct. at 421.

Or, as the 5th Circuit has noted:[A]ppellants cannot successfully claim that the detention exceeded its original scope. Appellants concede, and we have no doubt, that in a valid traffic stop, an officer can request a driver's license, insurance papers, vehicle registration, run a computer check thereon, and issue a citation. *See Kelley,* 981 F.2d at 1469; *Guzman,* 864 F.2d at 1519. In this case, Officer LaChance asked

Shabazz to exit the vehicle and produce his driver's license. He then called in for a com-

puter check of the license. The questioning [and request for search] that took place occurred while the officers were waiting for the results of the computer check. Therefore, the questioning did nothing to extend the duration of the initial, valid seizure. Because the officers were still waiting for the computer check at the time that they received consent to search the car, the detention to that point continued to be supported by the facts that justified its initiation. *Cf. United States v. Sharpe,* 470 U.S. 675, 687, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605 (1985) ("Clearly this case does not involve any delay unnecessary to the legitimate investigation of the law enforcement officers.").

*Shabazz,* 993 F.2d at 437.

ous standard applies. Therefore, our task involves an application of the facts to the law, and that review is de novo. *Sheehy,* 2001 SD 130, ¶ 6, 636 N.W.2d at 452. De novo review is also appropriate because there was no dispute of fact about this issue. Akuba did not testify that he was coerced or otherwise failed to give consent. The only live witness on this issue was Oxner, and he was only asked one question on this subject: he said there was consent. The only other record evidence is the videotape, and "because we had the same opportunity to review the videotape ... as the trial court," we review the issue of Akuba's consent de novo. *Tuttle,* 2002 SD 94, ¶ 29 n. 11, 650 N.W.2d at 35 n. 11.

▇▇▇ [¶ 27.] Based upon our review of the videotape, we believe that Akuba gave three voluntary and unconditional consents to search within the first five minutes of the encounter. The video (and especially the audio portion) clearly reflect that Akuba voluntarily consented the first three times he was asked. Moreover, these consents were given after only brief questioning, Akuba was not under arrest, he was on a public interstate during daylight, and the dog in the car was not barking. "Because even persons who have been arrested and are in custody can voluntarily consent to a search ... we do not believe that the setting for [Akuba's] consent was unduly coercive." *Chaidez,* 906 F.2d at 382 (citing *United States v. Watson,* 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598, 609 (1976)).

[¶ 28.] Akuba, however, argues that exchanges four and five, *as they appear in a written transcript,* could be interpreted as impermissible demands to search that were the conditions for Akuba's release. To facilitate a review of this assertion, we have repeated all six exchanges in the written transcript in chronological order, but removed from their contextual ties, (for the full context *see supra* ¶¶ 5–8):

(1) OFFICER: Is it okay if I look in the car?

AKUBA: Yeah.

(2) OFFICER: I can look?

AKUBA: Um-hum.

(3) OFFICER: So you'll go ahead and let me look in the car then, Touray?

AKUBA: Um-hum.

(4) OFFICER: Then when [the license check] comes back you'll be free to go. If you let me look real quick—

AKUBA: Um-hum.

OFFICER:—we'll do that—

AKUBA: Um-hum.

OFFICER:—get you going here.

(5) OFFICER: Okay, you guys will be free to go if you let me search real quick....

AKUBA: Yeah.[10]

(6) OFFICER: Touray is going to let me look in the vehicle real quick and we'll get you guys going.

[¶ 29.] We first observe that the audio evidence of these exchanges reflects that three consents were obtained before the alleged "conditional" requests were made. Akuba clearly consented three times in the first five minutes of an entire stop and search that only lasted ten minutes. More importantly, the tone, pausing, and context of the officer's language in exchanges four and five reflect that they were not further requests for consent, but rather, were casual conversation *executing* the consent previously given. Although exchanges four and five were susceptible to interpre-

---

**10.** Only exchanges five and six occurred after the warning ticket and license check had been completed.

tation based solely upon a *transcript*, the actual audio reflects that they were conversational in tone and appear to merely have been made to keep Akuba informed of the process Oxner was going to follow after Akuba's consent to search. We also note that the one reference to the drug dog was not objectively coercive. The dog was in the canine officer's vehicle, and we see nothing coercive *per se* in disclosing the historically correct fact that this canine officer usually conducts drug sniffs around the exterior of lawfully stopped vehicles. We finally note that the officer's response to the radio dispatcher after exchange four (he had a vehicle for a search) reflects the officer's contemporaneous belief that he had already obtained consent to search. Therefore, we do not find that exchanges four and five demonstrate that the consent was conditional.

[¶ 30.] We again acknowledge that the historical question of consent to search is a question of fact. Furthermore, as an appellate court, we are bound to uphold a trial court's resolution of questions of fact unless the evidence convinces us that the trial court was clearly erroneous. *Almond*, 511 N.W.2d at 573. However, as previously discussed, the trial court's findings on consent were erroneously premised on incorrect legal conclusions that the officer impermissibly expanded the stop and that the consent obtained during that illegal detention was involuntary as a matter of law. We are not bound by such legal conclusions. Therefore, based on our de novo review of the audio evidence, we determine that Akuba's consent was voluntary.

[¶ 31.] We finally note that Oxner did not exceed the scope of Akuba's consent by searching the trunk. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reason-ableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 1803–1804, 114 L.Ed.2d 297, 302 (1991) (citations omitted). In *Jimeno*, the driver of a car told police that they could search the car. During the search, the officer opened a folded, brown paper bag on the floorboard of the car. The driver later argued that he had only meant to consent to a search of the visible interior of the vehicle, and not closed containers within it. The Supreme Court first noted that the consent was not limited in its scope. The Court then noted that the consent came after the officer had informed the driver that he believed the driver was carrying narcotics, and that "the scope of a search is generally defined by its expressed object." *Id.* Under those circumstances, the Supreme Court held that it was objectively reasonable for the officer to assume that the driver's general consent authorized a search of any items within the car that might contain drugs. *Id.* at 251, 111 S.Ct. 1801. *See also United States v. Pena*, 920 F.2d 1509 (10thCir.1990) (consent to search for drugs in car authorized tapping of external fender and probing of rear door panel after officer observed loose, crooked and missing screws); *United States v. Lechuga*, 925 F.2d 1035 (7thCir.1991) (consent to search for drugs in apartment authorized search of suitcase in closet); *see also* Charles H. Whitebread & Christopher Slobogin, Criminal Procedure: An Analysis of Cases and Concepts § 12.03 (4th ed 2000).

[¶ 32.] Here, Akuba gave a general consent to search for drugs, he did not subsequently limit this consent, and he

stood silently without objection while Oxner opened the trunk and duffel bags. Under these circumstances, it was objectively reasonable for the officer to assume that Akuba's consent to search for drugs included a search of any area that could contain drugs, which included the trunk of the vehicle.

[¶ 33.] It was also objectively reasonable to search the duffel bags in the trunk. As the Second Circuit Court of Appeals stated:

> It is self-evident that a police officer seeking general permission to search a vehicle is looking for evidence of illegal activity. It is just as obvious that such evidence might be hidden in closed containers. If the consent to search is entirely open-ended, a reasonable person would have no cause to believe that the search will be limited in some way.

*United States v. Snow,* 44 F.3d 133, 135 (2d Cir.1995). Or, as the United States Supreme Court has noted:

> A suspect may of course delimit as he chooses the scope of the search to which he consents. But if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization.

*Jimeno,* 500 U.S. at 252, 111 S.Ct. at 1804, 114 L.Ed.2d at 303. We therefore conclude that when viewed objectively, Oxner did not exceed the scope of Akuba's consent when he searched the duffel bags in the trunk of the rental car.

3. **Whether Paul, having failed to make any showing that she possessed a legitimate expectation of privacy in the trunk of the rental vehicle, had standing to challenge the search.**

[¶ 34.] After the trial court entered its memorandum opinion suppressing the evidence against Akuba, Paul filed a motion to join Akuba's suppression motion. The State filed a brief opposing Paul's motion. The State acknowledged that Paul had standing to challenge the initial traffic stop because a stop is a seizure of all persons in a vehicle. *State v. Krebs,* 504 N.W.2d 580, 584 (S.D.1993) (citing *United States v. Erwin,* 875 F.2d 268, 270 (10th Cir.1989)). Consequently, Paul had standing to challenge the legality of her own detention. *United States v. Ameling,* 328 F.3d 443, 446 n. 3 (8th Cir.2003) (citing *United States v. Lyton,* 161 F.3d 1168, 1170 (8th Cir.1998)). However, the State argued that Paul did not have standing to challenge Akuba's consent to search the trunk of the car. The State continues that argument, asserting that Paul lacks standing to challenge the search of the trunk because "Fourth Amendment rights are personal rights which ... may not be vicariously asserted." *Krebs,* 504 N.W.2d at 586 (quoting *Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 425, 58 L.Ed.2d 387, 394 (1978) (citation omitted)); *State v. Wilson,* 2004 SD 33, ¶ 24, 678 N.W.2d 176, 184 (passenger in a car lacks standing to challenge the legality of the driver's consent).

[¶ 35.] We agree that Paul, as a passenger in a rental car, may challenge Akuba's consent to search the vehicle only if she established "a legitimate expectation of privacy in the particular areas of the automobile searched." *Rakas,* 439 U.S. at 148, 99 S.Ct. at 433, 58 L.Ed.2d at 404. In determining whether Paul had that legitimate expectation of privacy, we look for the following facts:

> [A] legitimate presence in the area searched, possession or ownership of the area searched or the property seized, prior use of the area searched or the property seized, ability to control or exclude others' use of the property, and a subjective expectation of privacy.

*Krebs,* 504 N.W.2d at 587 (quoting *United States v. Lochan,* 674 F.2d 960, 965 (1st Cir.1982); *United States v. Carter,* 854 F.2d 1102, 1105 (8th Cir.1988)); *Wilson,* 2004 SD 33, ¶ 26, 678 N.W.2d at 184. We must also remember that Paul had the burden of proving her legitimate expectation of privacy in the area searched. *Wilson,* 2004 SD 33, ¶ 25, 678 N.W.2d at 184 (citing *Rakas,* 439 U.S. at 148, 99 S.Ct. at 433, 58 L.Ed.2d at 404); *United States v. Salter,* 358 F.3d 1080, 1084 n. 2 (8th Cir. 2004) (citing *United States v. Gomez,* 16 F.3d 254, 256 (8th Cir.1994)).

[¶ 36.] Here, however, Paul did not testify or present any evidence supporting any relationship with the rental vehicle, its trunk, or the duffel bags containing marijuana. That failure to present any evidence would normally be fatal to her motion because she carried the burden of proof. *Wilson,* 2004 SD 33, ¶ 25, 678 N.W.2d at 184. Moreover, Paul may have been unable to meet that burden because her brief maintains that she "never had access to the trunk; that she was never in possession of the keys to the vehicle; that she had no property in the trunk[,]" and that she "had no control over the trunk of the car, nor the ability to exclude others from entering it."

[¶ 37.] Nonetheless, we address this issue because the trial court misapplied the applicable law and burden of proof. Although the State's attorney argued that Paul "has not met her burden of showing a legitimate expectation of privacy," the trial court disagreed, insisting that the detention of both Paul and Akuba was illegal, and further stating that the court's "primary decision [was] based on [ ] the fruit of an illegal detention of this young lady rather than her expectation of priva-cy." Additionally, when the State argued that Paul had the burden "to present some evidence to show that she has [an] expectation of privacy," the trial court disagreed, and incorrectly placed that burden on the State:

COURT: Does not the State even—like when they are seeking to forfeit property—have to establish, first of all, that there is some evidence against her somehow tying the pot to her?

STATE: I don't know anything about civil forfeiture.

COURT: It's the same thing. You are saying, prove you're innocent. Is there not a threshold burden for the State to come forward and show some evidence of guilt before some connection—some connection to the contraband before the other party has to show some reason why it can't be tied to them in one way or another?

STATE: In reading the *Krebs* decision,[11] I don't think there is, Your Honor. I mean, I can only rely on that decision and indicate to you that that court plainly said it was the passenger's burden of proof to show expectation of privacy.

COURT: This is not stuff sitting in the passenger seat. This is stuff that's in a trunk in which the State is saying—and the critical arguments particularly on cars is she's not an owner of this vehicle, is not a renter of the motor vehicle and so she has—the State has to establish to me somewhere that that stuff hidden in the trunk of the car is her's.

STATE: That's the defendant's burden of proof, Your Honor.

COURT: No. No. No. The people in this country don't have to walk around prov-

11. In *Krebs,* this Court stated that the passenger "bears the burden of proving he had a legitimate expectation of privacy." 504 N.W.2d at 586 (citing *Rawlings v. Kentucky,* 448 U.S. 98, 105, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633, 641 (1980)).

ing that they didn't do something wrong.[12] The first threshold is on the State to prove that they did do something wrong. The first interest here for the State is to establish that somehow or another she is connected to the pot in the trunk. It's not sitting in the back seat. It's not sitting in the glove compartment. She's not smoking a joint. There is no connection between someone the State urges is simply riding in the car much like a hitchhiker.

[¶ 38.] After further discussion on the standing issue, the trial court continued to focus on the circumstances surrounding the stop and the request for consent to search without considering Paul's standing. The court ultimately noted that its ruling was not based on any expectation of privacy (standing) by Paul. Rather, the trial court indicated that its decision was based on its ruling that the search was the fruit of an illegal detention. We have, however, determined that the trial court erred in that ruling. Therefore, Paul should have been given an opportunity to establish that she had a reasonable expectation of privacy in the trunk of the rental vehicle.[13] However, we need not remand for a standing hearing because Akuba's consent was valid. Because Akuba's con-

sent was valid, Paul could not prevail even if she had standing.

[¶ 39.] Reversed.

[¶ 40.] GILBERTSON, Chief Justice, and KONENKAMP, Justice, concur.

[¶ 41.] SABERS and MEIERHENRY, Justices, dissent.

SABERS, Justice (dissenting).

[¶ 42.] I dissent. It is past time for this Court to act to protect the Fourth Amendment rights of motorists and their passengers from the fishing expeditions of law enforcement officers. Because of the inherently coercive nature of traffic stops and the overreaching by law enforcement in the interest of drug interdiction, we should require that officers have a reasonable suspicion that criminal activity is afoot before they are entitled to request consent to search.

[¶ 43.] Black's Law Dictionary provides in part that voluntary means: "Unconstrained by interference, unimpelled by another's influence, spontaneous, acting of oneself. [ ] Done by design or intention. [ ] Proceeding from the free and unrestrained will of the person. Produced in or by an act of choice. Resulting from

12. The trial court's declaration of an impermissible contradiction between the State's obligation to prove guilt for possession of a controlled substance and the defendant's obligation to prove standing has been rejected by the United States Supreme Court. It stated:

We need not belabor the question of whether the "vice" of prosecutorial contradiction could alone support a rule countenancing the exclusion of probative evidence on the grounds that someone other than the defendant was denied a Fourth Amendment right. The simple answer is that the decisions of this Court, especially our most recent decision in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), clearly establish that a prosecutor may simultaneously maintain that a defendant

criminally possessed the seized good, but was not subject to a Fourth Amendment deprivation, without legal contradiction. *United States v. Salvucci*, 448 U.S. 83, 90, 100 S.Ct. 2547, 2552, 65 L.Ed.2d 619 (1980). Therefore, as noted by one author, "it is now possible . . . for the prosecutor to assert, without contradiction, that the defendant does not have standing (i.e., a legitimate expectation of privacy in the place searched) and contend at trial that the defendant owns the property seized." Whitebread & Slobogin, *supra* ¶ 28, § 4.04.

13. Paul noted that "[w]e're not even going to get to that" due to the trial court's granting of the motion to join Akuba's motion to suppress.

free choice without compulsion or solicitation. [ ] The word, especially in statutes, often implies knowledge of essential facts." Black's Law Dictionary 1575 (6th ed 1990) (internal citations omitted). The State has a burden to establish by clear and convincing evidence that "the search was the result of free, intelligent, unequivocal and specific consent without *any* duress or coercion, actual or implied." *State v. Almond,* 511 N.W.2d 572, 574 (S.D.1994) (emphasis added) (citation omitted).[14]

[¶ 44.] The cases relied upon by the State and the majority opinion have consistently bent or stretched the word voluntary to the point where it is completely out of shape and without meaning. As in previous cases, by coming to the conclusion that Akuba voluntarily consented to the search, the majority opinion utterly disregards the reality of a traffic stop by a drug interdiction unit on a South Dakota highway.

[¶ 45.] First, the criteria for permissibly detaining a motorist are as endless as the officers imagination. For example, any citizen may be detained for deviating within his lane of travel, crossing over the center line or the fog line, failing to appropriately use a turn signal, exceeding the speed limit, or failing to meet the minimum speed limit. As this case illustrates, one can be detained for exceeding the speed limit by three miles per hour. *See e.g. State v. Ballard,* 2000 SD 134, ¶ 11, 617 N.W.2d 837, 840–841 (center line and fog line); *State v. DeLaRosa,* 2003 SD 18, ¶ 2, 657 N.W.2d 683, 684 (turn signal). This is so even when the officer has no intention of ticketing the driver for the infraction. Therefore, almost every driver on a South Dakota highway may be de-

tained by a highway patrol officer at any given time.

[¶ 46.] Second, Akuba's assertions regarding the legality of this stop deserve greater attention than the majority opinion provides. The facts point to racial profiling. Specifically, Oxner saw an African American driver in a vehicle with out-of-state license plates. He turned around, followed the vehicle for two miles and pulled the driver over for exceeding the speed limit by three miles per hour. It is noteworthy that the facts of this case bear a striking resemblance to those in a previous stop executed by Oxner. The dissenting opinion in that case noted,

> If there ever was a clear case of racial profiling, it is this case. By affirming these convictions, the majority gives support to police officers in this circuit who seize and search individuals because of their race. [ ] In the present case, Martinez and Cortez–Gomez were driving through the State of South Dakota in broad daylight when a state trooper traveling in the opposite direction observed their vehicle. The unrefuted evidence is that when the trooper noticed that the driver (Martinez) was Hispanic and that the vehicle he was driving bore California plates, the trooper did a "180" on the highway and proceeded to follow the vehicle. After doing so for approximately five miles, the trooper pulled the vehicle over for momentarily crossing the fog line in violation of South Dakota law.

*United States v. Herrera Martinez,* 354 F.3d 932, 935 (8th Cir.2004) (Lay, circuit judge, dissenting). As in the present case,

> The record clearly shows that [the defendant's] driver's license and registration were in proper order. The record further shows that [the defendant's] responses to the trooper's questions regarding his destination and purpose did

---

**14.** I join Justice Meierhenry's special writing to the extent that it holds we should maintain the clear and convincing evidence rule for consent to search.

nothing to arouse suspicion. Simply put, the trooper had no reasonable or articulable basis upon which to suspect the Defendants of drug activity.

*Id.* A racial profile is an insufficient basis upon which to allow a seizure under the Fourth Amendment. To simply state that the Defendant's argument is "without merit" in the face of clear indications to the contrary is an abdication of this Court's duty to prevent such overreaching by law enforcement.

[¶ 47.] Third, this Court's recent decisions regarding the *officer's* rights during a traffic stop make clear that the officer has carte blanche authority to extend the traffic stop for the purpose of drug interdiction, contrary to the "free to go rule" of *Ballard*, 2000 SD 134 at 17, 617 N.W.2d at 842. For example, if an officer requests consent to search and the citizen denies permission, the officer need only bring a canine unit to the scene. The majority of this Court has held, contrary to *Terry*, that an officer may extend a traffic stop, even after its purpose has been accomplished, and without reasonable suspicion, to bring a drug dog to the scene. *DeLaRosa*, 2003 SD 18, at ¶ 14, 657 N.W.2d at 688. Once the officer brings a dog onto the scene, the matter may be over for the unwitting citizen, for the officer need only decide that his dog "alerted" in order to tear the vehicle apart. Citing our clearly erroneous standard of review, the majority of this Court upheld such a search based on the officer's assertion that his dog's breathing pattern changed, despite audio evidence to the contrary. *See State v. Chavez*, 2003 SD 93, 668 N.W.2d 89. Finally, whatever the officer finds in the vehicle will be held against every passenger of the vehicle under the holding of *Wilson*, which denies passengers "standing" to contest the search of a motor vehicle. *State v. Wilson*, 2004 SD 33, 678 N.W.2d 176.

[¶ 48.] It is clear that Akuba would not have had the right to deny permission for the officer to perform a sniff search of his vehicle. However, Akuba was within his rights to deny permission for the officer to search the car without the dog. There is no indication in the record that Akuba had any idea that he could deny such consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854, 875 (1973) (knowledge of the right to deny consent is a factor to be considered in determining voluntariness). This is true of the majority of motorists detained by police officers.

> [M]any persons, perhaps most, would view the request of a police officer to make a search as having the force of law.[ ] In the context of motor vehicle stops, where the individual is at the side of the road and confronted by a uniformed officer seeking to search his or her vehicle, it is not a stretch of the imagination to assume that the individual feels compelled to consent. *Cf. Wesley MacNeil Oliver, With an Evil Eye and an Unequal Hand: Pretextual Stops and Doctrinal Remedies to Racial Profiling*, 74 Tul. LRev 1409, 1465 (2000) (stating that "[p]sychological studies further confirm that ... there is an almost reflexive impulse to obey an authority figure."); *see also Adrian J. Barrio, Note, Rethinking Schneckloth v. Bustamonte: Incorporating Obedience Theory into the Supreme Court's Conception of Voluntary Consent*, 1997 U Ill L Rev 215, 233–40 (discussing psychological studies regarding authority figures).

*State v. Carty*, 170 N.J. 632, 790 A.2d 903, 910 (2002) (additional citation omitted). This is particularly so in this case where there is no indication whatsoever that Akuba realized that he was free to go without

consenting to the search; a misperception which may have been perpetuated by the officer's conditional statements indicating Akuba would be "free to go" "if you let me look real quick[.]" In fact, Akuba was clearly under police control at the time he "consented" to the search. He was in a patrol car, the officer retained his papers, there was a drug dog whining in the seat directly behind him, and the officer's "request" for consent was less than clear. As the trial court noted in its findings:

> Prior to completing his traffic investigation, Oxner advised Defendant that he was a narcotics officer and would have his dog sniff around Defendant's vehicle. Immediately following the foregoing, he asked if he could "look in the vehicle." There was no basis to expand the traffic investigation to a search of the vehicle. Defendant was under detention and clearly not free to leave at that time. The sequencing of the "drug dog plan" and "is it okay if I look in the car" is such that reasonable people could and would infer that there was no choice in the matter-that the officer was going to look in the car anyway. Under these circumstances, reasonable people would likely conclude that the look in the car would be the visual inspection as the officer accompanied the dog and not a search including the opening of trunks, glove compartments, luggage, purses, looking under seats etc.

The majority opinion disregards the trial courts findings of fact to come to the conclusion that Akuba consented. The basis for this appellate finding of fact is apparently that Akuba said "um-hmm" three times. However, our legal standard for determining whether consent was voluntary is whether "the search was the result of free, intelligent, unequivocal and specific consent without *any* duress or coercion, actual or implied." *Almond*, 511 N.W.2d at 574 (citation omitted). The Constitution of the United States and the State of South Dakota prohibit unreasonable searches and seizures. Coercing consent to search in these circumstances constitutes an unreasonable search and seizure as prohibited by the constitutions.

[¶ 49.] The fact that a person verbally agreed to a search is not proof positive that they legally consented to a search. In this case, the fact finder, whose findings are to be overturned only if clearly erroneous, found no consent.[15]

[¶ 50.] I have previously noted:

> In *Schneckloth v. Bustamonte*, the United States Supreme Court pointed out that the utility of a consent search was evident in "situations where the police have *some* evidence of illicit activity, but lack probable cause to arrest or search[.]" 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854, 863 (1973) (listing as further justification for consent searches instances where 1) police seek to investigate suspicious circumstances or 2) to follow up leads developed at the scene of a crime).

*State v. Dreps*, 1996 SD 142, ¶ 28, 558 N.W.2d 339, 345 (Sabers, Justice, dissenting). Although the majority opinion directly addresses the question whether an officer must have probable cause to extend a traffic stop to request consent for a search, it does not address the question whether a lower quantum of suspicion is necessary. I urge the Court to require officers to have reasonable suspicion of criminal activity before they are entitled to request permission to search a vehicle.

---

15. It is hard to resist the conclusion that the deference normally given to the fact finder does not apply when it would work against a position of the State. *See Chavez,* 2003 SD 93, 668 N.W.2d 89.

An honest appraisal of the typical traffic stop must come to the conclusion that it is an inherently coercive situation in which very few citizens understand their constitutional protections.

[¶ 51.] In the interest of drug interdiction, police officers are pulling motorists over for minor infractions and coercing consent to search by implying that regardless of consent, a search will be conducted. "Treating all citizens like criminals in order to catch the malefactors among us represents an unwise policy choice, an outlook favoring crime prevention over all of our other values." *Carty*, 790 A.2d at 908 (citation omitted). The Court should acknowledge the reality of "consent" searches on South Dakota highways. A citizen pulled over to the side of the road and brought to a trooper's car would not feel free to terminate the encounter and carry on with their business. *See e.g. Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389, 400 (1991) ("the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.") (citation omitted). Therefore, the encounter is inherently coercive and an officer should be required to meet a threshold evidentiary standard before "requesting" such consent. *See e.g. Carty*, 170 N.J. 632, 790 A.2d 903; *State v, Quino*, 74 Haw. 161, 840 P.2d 358, 364–365 (1992), *cert denied*, 507 U.S. 1031, 113 S.Ct. 1849, 123 L.Ed.2d 472 (1993). This requirement would impose no undue hardship on officers or the courts for as the New Jersey Supreme Court noted, reasonable suspicion is a "well established constitutional requirement under the Fourth Amendment and the comparable provision of the [state] constitution to determine the rea-

sonableness of police conduct." *Carty*, 790 A.2d at 914.

[¶ 52.] This approach would align our jurisprudence with the actual interests underlying the Fourth Amendment. As the Supreme Court has noted, when a court weighs Fourth Amendment reasonableness in the context of traffic stops, the State's interests are weighed more heavily than the motorists' interests where the subject matter concerns the privilege of driving on the highways. *United States v. Valadez*, 267 F.3d 395, 399 (5th Cir.2001) (Garwood, concurring) (citing *Michigan Dept. of State Police v. Sitz*, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) (additional citation omitted)). On the other hand, the interests of the motorist are weighed more heavily where the subject matter is "the general interest in crime control." *Id.* (citing *City of Indianapolis v. Edmond*, 531 U.S. 32, 121 S.Ct. 447, 453, 148 L.Ed.2d 333 (2000)). Drug interdiction falls squarely within "the general interest in crime control," and therefore this Court should consciously weigh the interests of the presumptively innocent motorist more heavily than the interest of the State.

[¶ 53.] I would affirm the trial court's grant of Akuba's motion to suppress. The trial court ruled that the State failed to prove that Akuba had voluntarily consented to the search. The court arrived at that conclusion by reasoning that Officer Oxner improperly expanded the scope of the traffic stop by engaging in "impermissibly intrusive" questioning beyond the scope of a routine traffic stop. This conclusion is supported by the requirements underlying Fourth Amendment protections in the context of a traffic stop. As the Eighth Circuit Court has noted, after a valid initial stop, an officer is permitted to "ask any questions reasonably related to the stop." *United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir.1994).

If reasonably related questions raise inconsistent answers, or if the licenses and registration do not check out, a[n] [officer's] suspicions may be raised so as to enable him to expand the scope of the stop and ask additional, more intrusive questions. If, however, no answers are inconsistent and no objective circumstances supply the [officer] with additional suspicion, the [officer] *should not expand the scope of the stop.*

*Id.* Officer Oxner found no objective circumstances to provide him with the additional suspicion necessary to expand the scope of the stop beyond its original justification. Therefore, his expansion of the scope of the stop to request consent to search went beyond the mandates of *Terry v. Ohio,* which requires that the officer's action be "justified at its inception" and that the action be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio,* 392 U.S. 1, 19–20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905 (1968). The circumstance that "justified" Oxner's interference was Akuba's traveling at three miles per hour over the speed limit. There is no relation between this minor traffic violation and a full blown search of Akuba's vehicle other than the officer's desire to garner consent to search. Furthermore, the officer was bound by the requirement that his intrusion be "temporary and last no longer than is necessary to effectuate the purpose of the stop." Finally, "the [ ] methods employed should be the least intrusive means reasonably available [to the officer] to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325–26, 75 L.Ed.2d, 229, 238 (1983). Although Oxner had a canine unit immediately available to him, he chose the much more intrusive alternative of requesting a full search of the vehicle, including the interior, trunk and the baggage in the trunk. The trial court did not err in its determination that Oxner's actions were "impermissibly intrusive."

[¶ 54.] Oxner's extended detention of Akuba beyond the time the purpose of the traffic stop concluded and when the officer had no reasonable suspicion of criminal activity was unlawful. Therefore, even assuming that Akuba voluntarily consented to the search, since the involuntarily obtained consent created an unlawful seizure, the exclusionary rule requires suppression of the evidence obtained by the officer. *Id.*

[¶ 55.] The trial court ultimately concluded that the illegal detention, coupled with the "threat" to use the drug dog, coerced Akuba's consent and rendered it involuntary as a matter of law. As indicated, I agree with the trial court for the most part and would affirm the motion to suppress.

[¶ 56.] At the very least, in deciding whether consent was voluntary, courts should require the prosecution to prove voluntariness by a preponderance of the evidence. Here, the trial court held that the State failed in their burden of proving voluntary consent whether the burden was "by a preponderance of the evidence" or by "clear and convincing evidence." We should affirm the trial court.

[¶ 57.] The judiciary is the only barrier to police violations of our citizens' constitutional rights. We should act to ensure that the basic protections of the Fourth Amendment are afforded to all citizens; even those who drive or ride in vehicles.

[¶ 58.] I would affirm the trial court's holding that the illegality of the consent to search carries over to Paul. In that respect, I disagree with the majority opinion's decision to reverse on standing. I particularly disagree with the proposition

that the State may claim on the one hand that the defendant had sufficient control over the trunk to be in possession of the drugs but on the other hand, she had insufficient control over the trunk to have standing to protest the search.[16] Clearly, under these circumstances, she would have a reasonable expectation of privacy.

MEIERHENRY, Justice (dissenting).

[¶ 59.] I join Justice Sabers' dissent.

[¶ 60.] I also disagree that we should lower the standard of proof required of the State to prove voluntary consent to a warrantless search.[17] Today, the majority reduces the State's burden of proving voluntary consent from the clear and convincing standard to the preponderance standard. It does so without any compelling reason. The majority gives as reasons (1) conformity with the burden of proof used by the United States Supreme Court and the Eighth Circuit Court of Appeals, (2) conformity with other courts that do not require clear and convincing evidence to prove consent, and (3) consistency with the burden of proof we use in determining voluntariness of confessions. *Supra* ¶ 13. None of these reasons are compelling.

[¶ 61.] First, historically we have chosen not to follow the federal court's standard of proof for voluntary consent searches. The United States Supreme Court has expressly applied the preponderance standard since 1974. *U.S. v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242. The South Dakota Supreme Court declined in 1977 to apply the same requirement and determined, instead, to require the higher standard of clear and convincing evidence to show voluntary consent to search. *State v. Kissner*, 252 N.W.2d 330 (S.D.1977). We have continued to use the clear and convincing standard to all consent searches up to the present. *State v. Cody*, 293 N.W.2d 440 (S.D.1980); *State v. Woods*, 374 N.W.2d 92 (S.D.1985); *State v. Nemeti*, 472 N.W.2d 477 (S.D.1991); *State v. Zachodni*, 466 N.W.2d 624 (S.D.1991); *State v. Almond*, 511 N.W.2d 572 (S.D. 1994); *State v. Fountain*, 534 N.W.2d 859 (S.D.1995); *State v. Dreps*, 1996 SD 142, 558 N.W.2d 339; *State v. Benallie*, 1997 SD 118, 570 N.W.2d 236; *State v. Morato*, 2000 SD 149, 619 N.W.2d 655; *State v. Guthrie*, 2001 SD 61, 627 N.W.2d 401.

[¶ 62.] Second, changing the standard to conform to those jurisdictions that have lower standards is not a compelling reason. That same analysis could justify maintaining the clear and convincing standard since numerous state courts use a "clear and convincing" standard.[18] Jurisdictions that

---

**16.** In this regard, I would urge the members of this Court to hold that the South Dakota constitution provides greater protection to a motorist than the federal constitution. Allowing such prosecutorial contradiction is fundamentally unfair and lacks any basis in common sense.

**17.** I agree that Akuba consented under the clear and convincing standard.

**18.** In Search and Seizure, it states, "Many states ... require the higher burden of 'clear and convincing evidence,' and some even proof beyond a reasonable doubt." John Wesley Hall, Jr., Search and Seizure, § 8.11, 514–15 (3d ed). Further, compared to the preponderance standard, "[a] larger number

of states adhere to the 'clear and convincing evidence' or similarly stated standard of review of voluntariness." *Id.* at n 207.

Jurisdictions that apply a clear and convincing or higher standard of proof include the following: *Phillips v. State*, 446 So.2d 57 (Ala.Crim.App.1983), *cert. denied*, 467 U.S. 1254, 104 S.Ct. 3541, 82 L.Ed.2d 845 (1984); *Rodriquez v. State*, 262 Ark. 659, 559 S.W.2d 925 (1978); *Stone v. State*, 348 Ark. 661, 74 S.W.3d 591 (2002) ("clear and positive"); *People v. Carlson*, 677 P.2d 310 (Colo.1984); *Wilson v. State*, 470 So.2d 1 (Fla.Dist.Ct.App.1984); *Lightford v. State*, 90 Nev. 136, 520 P.2d 955 (1974); *State v. Mann*, 103 N.M. 660, 712 P.2d 6 (N.M.Ct. App.1985); *People v. Tinneny*, 99 Misc.2d

have maintained the higher burden of proof do so based upon their independent interpretation of their own state's constitution. One of those jurisdictions, the Texas Court of Criminal Appeals, directly rejected a request to reduce the State's burden of proof. *State v. Ibarra*, 953 S.W.2d 242 (Tex.App.1997) (en banc). The *Ibarra* court construed independently the Texas Constitution to require the higher standard. Specifically, the *Ibarra* court stated,

although "we need not construe the Texas Constitution differently from the federal constitution, there is simply no getting around the fact that we construe it independently." Indeed, it seems odd to suggest that the measure of our state constitutional rights stems not from an independent assessment of our constitution but, rather, from the way in which our constitutional provisions are similar to or different from their federal counterparts. So, while Supreme Court analysis of federal constitutional provisions may enlighten our own constitutional endeavors, we are not bound by those interpretations.

*Id.* at 244 (internal citation omitted). The *Ibarra* court reviewed *Lego v. Twomey*, in which the Supreme Court "decided that the government need only prove the voluntariness of a confession by a preponderance of the evidence" pointing out that the

Supreme Court specifically left the States free to apply a higher standard. 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). *Lego* specifically states,

The States are free, pursuant to their own law, to adopt a higher standard. They may indeed differ as to the appropriate resolution of the values they find at stake.

*Id.* (quoting *Lego*, 404 U.S. at 489, 92 S.Ct. at 627). The *Ibarra* court determined that the State failed to offer "any compelling reason to depart from the [clear and convincing] standard of proof" used to prove "the voluntariness of a consent to search." *Id.* at 245. Finally, it concluded that, the preponderance standard "does not satisfy the demands of the Texas Constitution art. I, § 9." [19] *Id.* at 245.

[¶ 63.] Under similar reasoning, we should not reduce the standard to preponderance. Here, the only reason the State gives for the requested change is that other courts use the preponderance standard. The fact that the federal courts and some state courts have applied the lower standard of proof is not a new legal concept. This has been the situation since we first adopted the clear and convincing standard in 1977. The State offers no compelling reason why this Court should lower the burden of proof after almost three decades of interpreting the South Dakota constitu-

962, 417 N.Y.S.2d 840 (Crim.Term 1979); *State v. Phillips*, 25 N.C.App. 5, 212 S.E.2d 172 (1975); *McMorran v. State*, 118 Nev. 379, 46 P.3d 81 (2002); *State v. Gregorio*, 142 N.J.Super. 372, 361 A.2d 586 (1976); *Coon v. State*, 587 P.2d 1373 (Okla.Crim. App.1978); *State v. Glenn*, 83 Or.App. 650, 732 P.2d 946 (1987); *Armstead v. State*, 677 S.W.2d 266 (Tex.Ct.App.1984); *State v. Mathe*, 35 Wash.App. 572, 668 P.2d 599 (1983); Mississippi requires proof of the voluntariness of consent beyond a reasonable doubt. In *Luton v. State*, 287 So.2d 269 (Miss.1973), *cert. denied*, 417 U.S. 920, 94 S.Ct. 2627, 41 L.Ed.2d 225 (1974), the court analogized the voluntariness of a con-

sent to the voluntariness of a confession which requires, in Mississippi, proof of voluntariness beyond a reasonable doubt. *Id.* at 272.

19. Vernon's Ann.Texas Const. Art. 1, § 9

Sec. 9. The people shall be secure in their persons, houses, papers and possessions, from all unreasonable seizures or searches, and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause, supported by oath or affirmation.

**430**

tion and the values it represents as demanding a higher standard of proof from the government in a consent search. We should not abandon our long established State's constitutional protections.

[¶ 64.] Third, consistency with the standard of proof for voluntariness of a confession is not required and can be distinguished. In *State v. Tuttle*, we lowered the standard of proof in suppression hearings involving custodial confessions. 2002 SD 94, ¶ 21, 650 N.W.2d 20, 30. The custodial confession in *Tuttle* involved the waiver of *Miranda* rights followed by a confession. *Id.; See also Cordell v. Weber*, 2003 SD 143, 673 N.W.2d 49; *State v. Wright*, 2004 SD 50, 679 N.W.2d 466. In contrast, this case involves a request to waive a constitutional right against unreasonable search and seizure. Here, the defendant was not arrested or subject to a custodial interrogation, the police officer had no probable cause to suspect criminal activity, and the officer did not give the defendant *Miranda* warnings or inform him of his right to refuse the request to search. The safeguards of *Miranda* warnings present in *Tuttle* are not present here. The chances of overreaching by law enforcement are far greater when the person subjected to the search is not advised of his constitutional rights, of his right to withhold consent or of his waiver of those rights by his consent.

[¶ 65.] Since 1977, we have held the State to the burden of clear and convincing evidence for a consent search. The State does not argue that the standard has been overly burdensome. Neither does the State identify compelling reasons to break with our own precedent and *stare decisis*. This Court saw fit to interpret the South Dakota Constitution to afford a higher standard of proof on a consent search. The interpretation was sound in 1977 and it is sound today. This Court should maintain the higher burden of proof of clear and convincing evidence for consent searches.